Filed 5/9/25  P. v. Bravo CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

| **California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.** |
| --- |

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GUILLERMO BRAVO,<br><br>    Defendant and Appellant. | D083258<br><br><br>(Super. Ct. No. SCN376259) |

APPEAL from an order of the Superior Court of San Diego County, Laura E. Duffy, Judge.  Affirmed.

Melanie L. Skehar, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Michal D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

Guillermo Bravo appeals from an order of the trial court denying his request for resentencing pursuant to Penal Code section 1170.95, now section

1172.6, following an evidentiary hearing.[1] Bravo asserts there was not substantial evidence to support the trial court's finding that he could be found guilty of murder beyond a reasonable doubt under the current law, and the trial court erred by refusing to consider his affirmative defense of defense of others. We conclude there was substantial evidence to support the trial court's findings, and any error in refusing to consider Bravo's affirmative defense was harmless. We therefore affirm the trial court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Plea Agreement

In 2017, the People charged Bravo, along with codefendant Jonathan Gonzalez,[2] of unlawfully murdering Jose Ortiz in violation of section 187, subdivision (a). In an amended complaint, filed in March 2018, they further alleged that Bravo personally used a firearm, to wit: a revolver or rifle, in the commission of the murder. At the preliminary hearing, defense counsel asserted the evidence "more closely fits into a voluntary manslaughter-type situation." The trial court acknowledged Bravo was not the actual killer but found sufficient cause to believe he was nevertheless guilty of murder and held both he and Gonzalez to answer.

Following the preliminary hearing, Bravo pled guilty to voluntary manslaughter and admitted that he personally used a firearm in violation of section 12022.5, subdivision (a), in exchange for a stipulated sentence of 21 years in prison. On the plea form, he stated that he "aided and abetted

---

[1]    All further statutory references are to the Penal Code. Assembly Bill No. 200 (Stats. 2022, ch. 58, § 10) renumbered section 1170.95 to 1172.6, effective June 30, 2022. We cite to the current statute herein.

[2]    Sandra Garcia was initially charged as well, but the charges against her were subsequently dismissed.

another to commit the unlawful killing of a human being, without malice, upon a sudden quarrel (i.e., voluntary manslaughter)," and "personally used a firearm in the commission of said offense."

## B.     Petition for Resentencing

In 2022, Bravo filed a petition for resentencing under current section 1172.6.  The People conceded Bravo had met his prima facie burden and the trial court ordered an evidentiary hearing.  In their return, the People argued Bravo was not entitled to resentencing under section 1172.6 because the evidence showed that he remained guilty beyond a reasonable doubt of murder as a direct aider and abettor with either express or implied malice.  Bravo asserted, to the contrary, that the prosecution relied on a natural and probable consequences theory at the preliminary hearing that is no longer viable.

## C.     Evidentiary Hearing

### 1.     People's Evidence

The People relied primarily on the prior record to meet their burden at the evidentiary hearing.  At their request, the trial court admitted into evidence a set of documents from the record of conviction including the complaints and plea form, the preliminary hearing transcript, and several photographs taken by law enforcement depicting the scene of the shooting.  At the court's request, the People also obtained and admitted into evidence a copy of Ortiz's death certificate, indicating the cause of Ortiz's death was homicide by gunshot.

### a.     Sergio C.'s Testimony

Sergio C. testified, reluctantly, in return for immunity, at the preliminary hearing.  He was good friends with Bravo in 2017 and had met Bravo's friends, Gonzalez and Garcia through Bravo.  Bravo called Sergio at

3

approximately 5:00 a.m. on February 27, 2017. Bravo told Sergio that someone had kidnapped Garcia, and he wanted to go and pick her up. Sergio agreed to drive and picked up Bravo and Gonzalez from a gas station. Sergio told Bravo that he needed to be back home by 7:15 a.m. to take his kids to school. They all smoked methamphetamine together in the car.

Sergio drove out to Valley Center, where Bravo believed Garcia was being held in a car with Ortiz. They eventually found the car in the parking lot of a library. Garcia was in the driver's seat and Ortiz was in the passenger's seat. Bravo and Gonzalez got out of their vehicle. Garcia got out of the other vehicle and jumped into Sergio's car. Meanwhile, Gonzalez was struggling with Ortiz near the other car. Sergio heard three shots, and then everyone got back in the car, and they left. Sergio saw a revolver in Bravo's hands after Bravo got back into the car to leave.[3] Sergio was in a bad accident after the shooting and had trouble remembering the details. He did not know why he did not call the police, but he did not expect Gonzalez or Bravo to shoot Ortiz.

A detective from the San Diego County Sheriff's Department testified that he interviewed Sergio in September 2017. Sergio said that Ortiz and Gonzalez were wrestling over what appeared to be a rifle. The single round was fired during the struggle and Ortiz fell back into the front passenger seat of the car. Around the same time, Bravo fired two shots from the back passenger door towards the front passenger seat. When they got into the car, they told Sergio that they would kill him and his family if he told anyone what happened.

---

[3] Sergio subsequently testified that he did not see Bravo with the revolver until they were getting out of the car after they returned home.

4

## b. Garcia's Jailhouse Statement

A sheriff's deputy testified regarding a conversation she had with Garcia while working undercover inside a jail. Garcia said that she and Ortiz had been fighting the morning of the shooting. They were at a casino, it was very late, and she was under the influence. Ortiz tried to take her home and leave her, but she was worried about him because he was also under the influence of alcohol and methamphetamine so she got back in the car with him. Garcia feared Ortiz and said he was being aggressive. She called her "homies" and asked them to come pick her up. By the time Garcia and Ortiz got to the library, Ortiz was sobering up and they were "just chilling." Garcia sent Bravo her location and when he got there, with Gonzalez and Sergio, she saw guns. She believed one of the guns jammed when Ortiz tried to grab it and then he got shot with a "sawed-off shotgun."

## c. Criminal Investigation

Another deputy testified that the Sheriff's department received a call for service at approximately 7:22 a.m. on February 27, 2017. They found a vehicle parked at the side of the road, partially obstructing traffic. The driver of the vehicle, later identified as Ortiz, was laid back in the driver's seat, with his mouth agape and his eyes partially closed. He did not have a pulse.

The deputy called the paramedics and, once they arrived, took photographs of the scene. He walked around the perimeter of the vehicle and found a shell casing to a .22 caliber round on the ground outside the passenger side door. He found several other unspent bullets and a loading tube for a semi-automatic .22 caliber rifle near the rear passenger side of the vehicle.

The paramedics removed Ortiz's sweatshirt and showed the deputy what appeared to be a bullet hole in his chest.  Later, during the autopsy, the medical examiner removed a bullet fragment from inside Ortiz's body.  The medical examiner stated the rounds went in a downward direction from the chest, ending up in the lower back region by the spine.

A detective obtained and reviewed video footage from the nearby library.  Ortiz and a woman, later identified as Garcia, were seen walking around the outside of the building at approximately 6:44 a.m.  There was no indication that they were arguing, and Ortiz did not lay his hands on Garcia.  He examined the vehicle Ortiz was driving and found two bullet fragments in the floorboard of the vehicle, next to the front passenger seat.  From this, he believed, based on the damage, that someone had fired a bullet into the car.

The detective identified Garcia and obtained her Facebook and phone records.  From the records, he could tell that Garcia and Bravo had exchanged several Facebook messages between 6:00 and 7:30 a.m. on the morning of the shooting.  Garcia sent Bravo her GPS location at 6:08 a.m.  Most of the content of the remaining messages had been deleted.  After the shooting, Bravo sent Garcia messages saying he was in Fontana, and Gonzalez, Garcia, and he could find a place to live and get jobs in Las Vegas.  The three did travel to Las Vegas together, but Garcia returned to San Diego.

The detective obtained a warrant and searched Bravo's residence.  Officers found a .22 caliber Ruger revolver and several loose rounds of mixed .22 caliber long rifle ammunition wrapped in a bandana inside an air conditioning vent.  It was "basically the same" mixture of ammunition that was found at the scene of the shooting.

6

## 2. Defense Evidence

The defense presented testimony from Bravo and his mother. Bravo's mother testified primarily about his upbringing, young age, and lack of maturity at the time of the shooting.[4] His mother had been in abusive relationships and raised him to be very protective of women. Bravo's uncle, to whom he was very close, was killed by a drunk driver when Bravo was 14 or 15 years old. Bravo went to the scene of the accident, and it had a serious impact on him. Bravo got in a skating accident at 17 or 18 and suffered a concussion. He was still immature at the time of the shooting, and did not have the capacity to be clear on his decisionmaking. Bravo asked his mother to give him a ride on the morning of the shooting, but she was unable to do so because she had younger children in the house.

Bravo testified that he got a call from Garcia on the morning of the shooting. She was crying and said she was in trouble and needed him to pick her up. He did not have a car, so he asked Sergio for a ride. He asked Gonzalez to come along because he was scared, and because Gonzalez was already there with him. He had done drugs with Ortiz in the past and knew that he had weapons.

They planned to get Garcia and leave. When they pulled up behind the car, they did not have time to plan or think. They also could not see which side of the car Garcia or Ortiz was on. On direct examination, Bravo said that he was by the back passenger side of Ortiz's car when he heard Gonzalez's gun go off. He ran back towards their car and saw that Garcia

---

[4] Bravo was born in August 1996 so he would have been 20 years old in February 2017.

was already in the car, so he "jumped back in, and we ended up leaving." He did not mention firing his own weapon.

On cross-examination, Bravo admitted that he had taken a revolver with him that morning, and he knew that Gonzalez had a rifle. When they got to the car, he went to the car to look for Garcia but did not see her. He started running back towards Sergio's car and saw that Garcia was getting into that car. Bravo said Ortiz and Gonzalez were by the passenger side of Ortiz's car. Bravo heard a gunshot, and he shot his own gun before running over to Gonzalez to make sure he was okay. Then they all left. When pressed, Bravo said he "shot in the general direction" of Ortiz, but "wasn't trying to hit him or anything." He continued, "I was just trying to make it stop." Later, he said "when I heard the shot, I just shot up. I shot up towards that way."

Bravo said they did not call the police because they were high and he "was going through a phase" where "you don't call the police." He was talking to Garcia while they were looking for her, so he knew that she was alive and able to communicate with her phone.

### 3. Trial Court's Ruling

The trial court noted it had reviewed the materials submitted for the hearing and was also considering the testimony of Bravo and his mother. It explained that the People had the burden to show beyond a reasonable doubt that Bravo could presently be convicted of Ortiz's murder under section 188 or 189, as amended. The court noted the parties agreed Gonzalez was the actual killer, so the People had to prove that Bravo, as his accomplice, by words or actions directly aided and abetted the commission of Gonzalez's life-endangering act of shooting Ortiz.

8

The trial court made the following factual findings: Bravo was present at the scene. Bravo arranged for Sergio to take him and Gonzalez to search for Garcia and confront Ortiz. He armed himself and knew Gonzalez was armed. Bravo was in communication with Garcia and directed Sergio where to go. Bravo located Ortiz's vehicle and provided armed support for Gonzalez. Bravo fired shots from his own weapon towards Ortiz as Ortiz was trying to grab Gonzalez's rifle, thereby escalating the situation. Bravo enlisted the help of Sergio and Gonzalez, with the intent that they work together to find Garcia and confront Ortiz, and then failed to take steps to prevent the murder. After the murder, Bravo and the others left the scene. Bravo hid the weapon he used at his mother's home, and then Bravo, Gonzalez, and Garcia left town and traveled to Las Vegas.

The trial court acknowledged that Bravo and Gonzalez seemed to be motivated to rescue Garcia, but found there was also evidence of their intent to knowingly engage in acts dangerous to human life. The court explained it was Bravo's actions "after finding and rescuing Sandra Garcia" that defined his liability for murder. As a result, the court found "Bravo directly aided and abetted the commission of a life-endangering act committed by Gonzalez and is guilty beyond a reasonable doubt of implied malice murder." Accordingly, the trial court concluded Bravo was ineligible for relief under section 1172.6.

Bravo filed a timely notice of appeal.

## II. DISCUSSION

Bravo asserts the trial court's factual findings are not supported by sufficient evidence and do not support its determination he remained guilty of murder beyond a reasonable doubt under a still valid theory. In addition,

9

he asserts the trial court erred in refusing to consider his defense of others affirmative defense.

## A.    Relevant Legal Principles

In 2018, the Legislature passed Senate Bill 1437 and "made significant changes to the scope of murder liability for those who were neither the actual killers nor intended to kill anyone, including certain individuals formerly subject to punishment on a felony-murder theory." (*People v. Strong* (2022) 13 Cal.5th 698, 707.)  "Senate Bill 1437 significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*Strong*, at pp. 707–708.)

In addition, "Senate Bill 1437 imposed a new requirement that, except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder.  (§ 188, subd. (a)(3).)  'Malice shall not be imputed to a person based solely on his or her participation in a crime.' (*Ibid*.)  One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine." (*People v. Curiel* (2023) 15 Cal.5th 433, 449.)  Thus, as the law now stands, "[o]utside of the felony-murder rule, 'a conviction for murder requires that a person act with malice aforethought.  A person's culpability for murder must be premised upon that person's own actions and subjective mens rea.' " (*Id.* at p. 448.)

Following these legislative changes, aiding and abetting second degree implied malice murder remains a valid theory of liability.  (*People v. Gentile* (2020) 10 Cal.5th 830, 850; *People v. Vizcarra* (2022) 84 Cal.App.5th 377,

391.) " '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.' " (*People v. Reyes* (2023) 14 Cal.5th 981, 990–991 (*Reyes*).) Under this theory of liability, the aider and abettor must by words or conduct aid the commission of a life-endangering act, have personal " 'knowledge that the perpetrator intended to commit [an act that is dangerous to human life], inten[d] to aid the perpetrator in the commission of the act, . . . and act[ ] in conscious disregard for human life.' " (*Id.* at p. 991, italics omitted.)

Senate Bill 1437 also enacted current section 1172.6, which permits defendants "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" (§ 1172.6, subd. (a)(1)) to file a petition requesting that their conviction be vacated on the grounds that they "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3).) If the defendant makes the requisite prima facie showing, the trial court shall issue an order to show cause why the relief should not be granted and shall hold an evidentiary hearing to determine whether to vacate the conviction at issue and resentence the defendant on any remaining counts. (*Id.*, subds. (c), (d)(1).)

At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness

11

testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. . . . The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

Where, as here, the trial court finds that the prosecution has met its burden to prove beyond a reasonable doubt that the defendant could have been convicted under the current law, we review the trial court's factual findings for substantial evidence. (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1017; *People v. Wilson* (2023) 90 Cal.App.5th 903, 916.) We review the record in the light most favorable to the judgment, and consider whether there is sufficient evidence of reasonable, credible, and solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Henley,* at p. 1017.)

To the extent that our analysis turns on the application of the facts as found by the trial court to the law, our review is de novo. (*Henley, supra,* at p. 1017; *Wilson, supra,* at p. 916.) Thus, "where there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes, supra,* 14 Cal.5th at p. 988.) At the same time, though, we presume the trial court was aware of and followed applicable law unless the record

12

affirmatively demonstrates error.  (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.)

### B. The Trial Court's Findings Are Supported by Substantial Evidence and Support a Still Valid Theory of Murder

Bravo first asserts the trial court's factual findings do not support liability for murder under the current law, as amended.

Rather than viewing the record in the light most favorable to the judgment, as he must on appeal, Bravo characterizes the evidence in the light most favorable to his defense.  (See *Henley, supra,* 85 Cal.App.5th at p. 1017.)  Bravo asserts it was uncontroverted that his intent was to rescue Garcia, but, as he acknowledges, the trial court found he "sought to confront Ortiz" as well.  There was evidence to support that finding.  Garcia was in communication with Bravo and able to use her phone to provide her location, but neither she nor Bravo called the police.  Instead, Bravo recruited two friends, one of whom was armed, and armed himself.  It is reasonable to infer from this evidence that Bravo intended for him and Gonzalez to confront Ortiz with firearms.

Bravo next asserts there was no evidence he knew Gonzalez would fire his rifle and that he, himself, only shot "up" to stop the struggle.  Based on this characterization, he asserts this case is like *In re Ferrell* (2023) 14 Cal.5th 593 (*Ferrell*), in which our high court found that if the jury credited Ferrell's testimony that "he was pointing the gun to 'the air' the 'whole time,' never at people, and the shooting was accidental in this way," they could have found that he did not have the requisite malice for second degree murder.  (*Id*. at pp. 597–598, 605–607.)  But there, the court was considering the accuracy of the jury instructions, and thus the standard of review was different.  The court did not make its own factual findings, and instead, "consider[ed] whether a reasonable jury, given the findings actually made

13

and the state of the evidence, could have found in favor of the defendant." (*Id*. at p. 605.)

Here, the trial court found that Bravo arranged for the trio to confront Ortiz. Bravo was armed and he knew that Gonzalez was armed. Once they found Ortiz's vehicle, Bravo provided armed support and shot his own weapon *towards Ortiz*. These findings were supported by Bravo's own testimony. Only once did he state that he intended to shoot "up" to stop the conflict. He also stated that he "shot in the general direction of Ortiz," who was in the vehicle in front of him. The sheriff's department found two bullet fragments in the floorboard of the vehicle, next to the front passenger seat, indicating that someone had fired a bullet into the car. Bravo asserts there was also a potential inference that the bullet fragments came from the bullet Gonzalez shot into Ortiz's body, but in doing so, Bravo continues to disregard the applicable standard of review.

The trial court's findings support its conclusion that Bravo remained guilty beyond a reasonable doubt of second degree implied malice murder. Second degree murder requires malice aforethought but does not require evidence of premeditation or deliberation. (*Ferrell, supra,* 14 Cal.5th at p. 600.) To be guilty of second degree implied malice murder, as the trial court found, the People had to prove that Bravo directly aided and abetted the commission of Gonzalez's life-endangering act of shooting Ortiz.

"Implied malice requires proof of both a physical act and a mental state. Physically, a defendant must perform an act whose natural consequences are dangerous to life, or put another way, defendant must perform ' "an act that involves a high degree of probability" ' of death." (*Ferrell, supra,* 14 Cal.5th at p. 600.) "To establish the mental state required for implied malice, the defendant must deliberately perform the act with a

14

conscious disregard for life, knowing the act endangers another's life." (*Ibid*.) In the context of a direct aider and abettor, the defendant, Bravo, must have, acting in conscious disregard for human life, "by words or conduct, aid[ed] the commission of the life-endangering *act*, not the result of that act," knowing "the perpetrator intended to commit *the act*, [and] that *the act* [was] dangerous to human life" (*Reyes, supra,* 14 Cal.5th at p. 991.)

Bravo did so by gathering the group and going after Garcia and Ortiz themselves, knowing that he and Gonzalez were both armed. Rather than tell Garcia to call the police, or to run to the safety of their car, Bravo and Gonzalez confronted Ortiz, with loaded firearms. Bravo provided armed cover to Gonzalez as he approached Ortiz, and then shot his own weapon towards Ortiz while Ortiz and Gonzalez wrestled over Gonzalez's rifle. As the trial court explained, it was Bravo's actions after they had already found and rescued Garcia that defined his liability for murder. By providing cover while Gonzalez approached Ortiz, with his gun drawn, Bravo knowingly aided Gonzalez, with the knowledge that the armed aggression was dangerous to human life. After the attack, Bravo and Gonzalez left the scene without rendering aid and Bravo hid the weapon and fled town. These actions were further evidence the shooting was not accidental, and Bravo intended to confront Ortiz.

For these reasons, we conclude the trial court's factual findings were supported by substantial evidence, and the evidence supported the court's conclusion that Bravo remained guilty of second degree implied malice murder beyond a reasonable doubt.

### C. Any Error in Failing to Consider Bravo's Affirmative Defense Was Harmless

Bravo next contends the trial court erred by failing to consider his affirmative defense, i.e., defense of others.

15

As an initial matter, Bravo suggests the trial court denied his request to *present* evidence of his affirmative defense. He bases this argument on the trial court's comments at the end of the hearing, after all evidence had been presented, including Bravo's testimony. The trial court explained the sole focus of an evidentiary hearing under 1172.6 is whether the People can meet their burden to prove the petitioner was (or could be) convicted under a still valid theory of murder. It stated, "this does not mean that the petitioner is entitled to a bench trial de novo in which the People must prove all underlying facts of his original prosecution beyond a reasonable doubt." Accordingly, the court did not address the affirmative defense theory presented by defense counsel. Bravo does not point to anything in the record suggesting the trial court limited his ability to present evidence. That point is critical here because, as we discuss next, the evidence did not support a defense of others defense in the first instance.

Bravo points to section 1172.6, subdivision (d)(3), and asserts the statement, "[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens," permits petitioners to present new or additional evidence of an affirmative defense not previously raised. The People dispute this interpretation and argue any such evidence is limited to their respective burdens, neither of which include new affirmative defenses. Specifically, they assert, pursuant to section 1172.6, subdivision (a)(3), a petitioner has the burden to show they "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." This does not include affirmative defenses that were not previously raised, because any such defense would not be impacted by the changes to sections 188 or 189. (See, e.g., *People v. Mares* (2024) 99 Cal.App.5th 1158, 1168, review granted May 1,

16

2024, S284232 ["New evidence of misidentification could support a petition for a writ of habeas corpus, but it would not show that he cannot be convicted "because of" the changes to the law, as required by section 1172.6"].)

Whether section 1172.6, subdivision (a)(3) permits a petitioner to present new or additional evidence tending to prove an affirmative defense that was not previously asserted is a question of law that appellate courts review de novo, under well settled standards of statutory interpretation. (See *People v. Lewis* (2021) 11 Cal.5th 952, 961; *People v. Shulz* (2021) 66 Cal.App.5th 887, 893.) Here, neither party presents any prior published case addressing this same issue, nor are we aware of any, particularly in the context of an evidentiary hearing where the underlying conviction was entered pursuant to a plea agreement. Thus, it appears to be an issue of first impression. We decline to address the issue here, as it is not necessary to the resolution of the case before us.

As we explain, the affirmative defense at issue here, defense of another, reduces a charge of murder to manslaughter because it negates the malice element necessary to prove murder. (See *People v. Genovese* (2008) 168 Cal.App.4th 817, 829.) Although the trial court stated it did not believe it needed to consider that defense, it did consider whether the evidence proved that Bravo acted with express or implied malice. Thus, we conclude, as the People also assert, that even if the trial court erred by declining to consider Bravo's defense of another theory, the error was harmless because the trial court's factual findings with respect to implied malice establish the court would not have credited the defense in any event.

To justify a homicide based on self-defense or the defense of others, "the defendant must have reason to believe that the danger is *imminent* and that lethal force is *necessary* to prevent death or great bodily injury." (*People v.*

17

*Uriarte* (1990) 223 Cal.App.3d 192, 197; see also *People v. Butler* (2009) 46 Cal.4th 847, 868 ["both self-defense and defense of others, whether perfect or imperfect, require an actual fear of *imminent* harm"].) " ' "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice." ' " (*People v. Battle* (2011) 198 Cal.App.4th 50, 72.) " 'The principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related rules . . . . First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury." (*People v. Hardin* (2000) 85 Cal.App.4th 625, 629–630.)

Here, there was ample evidence the threat to Garcia was not *imminent* and that deadly force was not necessary to defend against any such threat. Bravo knew that Garcia had a phone and was able to communicate with him and to provide her exact location. Although Bravo testified that he believed she had been kidnapped, the evidence does not suggest a belief that she was in *imminent* danger. Sergio testified that Bravo got a call that Garcia had been kidnapped, was "getting slapped," and that Bravo wanted to go pick her up. Sergio said he "wanted to help him go pick her up because I don't agree with a man hitting a woman." While the allegation that Garcia was kidnapped was certainly concerning, nothing Sergio said suggested that Garcia was at imminent risk of death or serious bodily injury. When defense counsel asked if Bravo believed Garcia could be seriously harmed, Bravo responded, "Yeah. She was crying, actually." He did not provide any other basis to believe she was imminent danger. In fact, he admitted that the group took the time to use methamphetamine before leaving to find Garcia.

18

In addition, there was evidence that it took the group nearly half an hour to locate Ortiz's vehicle. In that time, Garcia suffered no physical injuries and made no suggestion to Bravo that she had. She also made no suggestion that Ortiz was armed. Thus, there was not sufficient evidence of an *imminent* threat that justified Bravo and Gonzalez exiting their own vehicle and approaching Ortiz with weapons drawn. In the time it took the group to locate Garcia, Bravo could have called law enforcement, or he could have simply told Garcia to run to their vehicle. In fact, Sergio testified that Garcia had left Ortiz's vehicle and entered Sergio's vehicle before Ortiz was shot, eliminating any need to take action to protect her.

Both self-defense and defense of others act as affirmative defenses in the sense that they preclude a finding of malice "because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid . . . death or serious injury at the victim's hand." (*People v. Rios* (2000) 23 Cal.4th 450, 461 [addressing self-defense]; *People v. Randle* (2005) 35 Cal.4th 987, 994−995 [applying same concept to defense of others].) Here, the trial court's factual findings supporting its implied malice ruling were inconsistent with a finding, necessary to establish defense of others, that Bravo lacked malice because he actually believed his actions were necessary to prevent death or serious bodily injury to Garcia. Based on the totality of evidence, the trial court found Bravo intended to confront Ortiz and knowingly engaged in acts dangerous to human life. In reaching that conclusion, the trial court necessarily considered Bravo's testimony that he was motivated to rescue Garcia, but found that Bravo was *also* motivated by an intent to affirmatively pursue Ortiz. That finding precluded reduction of the offense to manslaughter based on a defense of others theory. (See, e.g., *People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 [jury reasonably could have

19

concluded defendant was not entitled to self-defense because "he did not act on the basis of fear alone but also on a desire to kill his rival"]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081−1082 [evidence supported a finding of premeditation and deliberation, and not a spontaneous shooting resulting from an argument, where defendant armed himself and continued to pursue the victim]; *People v. Strozier* (1993) 20 Cal.App.4th 55, 63 [defendant not entitled to instruction on defense of others when he entered fight after delay and only when victim hit the defendant].)

Bravo asserts "[p]roviding new evidence to prove that he was affirmatively defending [Garcia] from Ortiz would negate the intent element that the People must prove beyond a reasonable doubt and would further substantiate that his murder liability was based on the natural and probable consequence of his actions in rescuing here, which is no longer a valid theory." But as noted, the trial court did not prevent him from presenting any such evidence. Rather, the evidence he did present did not establish a valid defense of others theory.

Based on the foregoing, we conclude any error in the trial court refusing to consider Bravo's affirmative defense in the context of his section 1172.6 petition was harmless.

### III. DISPOSITION

The order denying Bravo's petition for resentencing under section 1172.6 is affirmed.

KELETY, J.

I CONCUR:

IRION, Acting P. J.

20

Buchanan, J., Concurring.

Although I concur in the judgment, I write separately to address the purely legal question presented by the trial court's refusal to consider Guillermo Bravo's defense that the homicide was justifiable because it was committed in defense of another. (§ 197(3).) In my view, a petitioner like Bravo, who pled guilty before the 2019 changes to the law of murder and who has established a prima facie case of eligibility for relief under section 1172.6, subdivision (c), may assert a claim of justifiable homicide at the evidentiary hearing under subdivision (d)(3). I nevertheless agree with the majority that the error was harmless on this record.

The trial court gave the following explanation for its ruling: "Petitioner asserts that the court is required to consider affirmative defenses. The court finds that to be without support. [¶] Affirmative defenses in the context of Penal Code section 1172.6 are inapplicable. The People's only burden here is to prove the petitioner was convicted under a theory of liability that is still valid after the changes to Penal Code section 188 and 189. [¶] In this case, the sole focus was on whether the evidence showed the petitioner was a direct aider and abettor acting with malice aforethought. This does not mean that the petitioner is entitled to a bench trial de novo in which the People must prove all underlying facts of his original prosecution beyond a reasonable doubt. The People must simply prove beyond a reasonable doubt to the court that the petitioner is not eligible for resentencing within the meaning of the statute."

I appreciate that this is an issue of first impression on which the trial court had no appellate guidance. For several reasons, however, I believe this ruling was incorrect. First, it is contrary to the plain language of the statute as amended by Senate Bill No. 775 (2021–2022 Reg. Sess.). Section 1172.6,

1

subdivision (d)(3) now provides that at the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner *is guilty of murder* or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (Italics added.) Someone who has committed a justifiable homicide is not "guilty of murder" under California law. (§ 1172.6, subd. (d)(3).) More specifically, someone who acts in justifiable self-defense or defense of another is not guilty of murder. (§ 197(3).) Moreover, the "defendant is not required to establish self-defense or the defense of others to be entitled to a not guilty verdict; he need only raise a reasonable doubt. It ultimately is the prosecution's burden to prove the absence of justification beyond a reasonable doubt." (*People v. Lloyd* (2015) 236 Cal.App.4th 49, 63 (*Lloyd*), citing *People v. Banks* (1976) 67 Cal.App.3d 379, 384; see also *People v. Sanchez* (1947) 30 Cal.2d 560, 571.) Accordingly, the plain language of section 1172.6, subdivision (d)(3) allows a petitioner to assert that he is not "guilty of murder" because the prosecution has not met its burden of proving "beyond a reasonable doubt" that he did not act in justifiable self-defense or defense of another.

Case law has confirmed that "unless the prosecution can prove beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under current law, *the same standard governing conviction in the first instance*, the petitioner's homicide conviction must be vacated." (*People v. Cooper* (2022) 77 Cal.App.5th 393, 415, italics added.) The standard governing conviction in the first instance includes "the prosecution's burden to prove the absence of justification beyond a reasonable doubt." (*Lloyd, supra*, 236 Cal.App.4th at p. 63.)

2

Second, section 1172.6, subdivision (d)(3) states that at the evidentiary hearing, "[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." Thus, "the hearing does provide an opportunity for the prosecution and the petitioner to present evidence 'with respect to issues not previously determined.' " (*Garcia v. Superior Court* (2024) 106 Cal.App.5th 1005, 1018, quoting *People v. Farfan* (2021) 71 Cal.App.5th 942, 947.) This "makes sense given that [the statute] applies to convictions by plea, not just jury trials. In light of the limited record often available in cases resolved by plea, the provision allowing both parties to present evidence available for the first time postconviction enables them to meet their respective burdens of proof." (*People v. Myles* (2021) 69 Cal.App.5th 688, 699.) And by allowing both "the prosecutor *and the petitioner*" to offer new evidence "to meet *their respective burdens*" (§ 1172.6, subd. (d)(3), italics added), the statute expressly contemplates the existence of factual issues on which the petitioner bears a burden, such as the burden of raising a reasonable doubt as to justifiable self-defense or defense of another. (See *People v. Tewksbury* (1976) 15 Cal.3d 953, 963–964 [discussing defendant's "burden" of raising a reasonable doubt on facts negating element of crime, citing examples including *People v. Roe* (1922) 189 Cal. 548, 560–561, and describing *Roe* as holding that "when defendant asserts defense of the person of another as a defense to a charge of murder, she need only create a reasonable doubt that she killed with criminal intent"].)

Third, this result is consistent with the purpose of Senate Bill No. 775, which added the current language of subdivision (d)(3) and expanded the statute to cover manslaughter convictions. "When the Legislature added manslaughter to the covered crimes as part of Senate Bill No. 775 (2021–2022 Reg. Sess.), it did so out of concern that some defendants may have pled

3

guilty to voluntary manslaughter before 2019 to avoid being convicted of a charged murder under one of the theories eliminated or narrowed by Senate Bill No. 1437 in 2019." (*People v. Gaillard* (2024) 99 Cal.App.5th 1206, 1213, fn. 4, citing Assem. Com. on Public Safety, Analysis of Sen. Bill No. 775 (2020-2021 Reg. Sess.) as amended July 6, 2021, p. 7 ["a petitioner may have pled guilty or no contest to voluntary manslaughter in order to forego the risk of being convicted of murder or attempted murder under one of these subsequently abrogated theories of liability."].) In this case, for example, Bravo may have pled guilty to voluntary manslaughter in 2018 and elected to forego presenting a justifiable homicide defense to avoid the possibility of a life sentence for murder under the now-invalid natural and probable consequences doctrine. By giving Bravo and others in his position an opportunity to submit "new or additional evidence" in an evidentiary hearing to determine whether they are "guilty of murder" under current California law (§ 1172.6, subd. (d)(3)), the Legislature permitted them to assert any claim of justifiable homicide they may have elected to forego when they pled guilty to manslaughter.

Finally, if we were to conclude that a homicide guilty plea forecloses a section 1172.6 petitioner from presenting any defense they could have presented in a jury trial, we would effectively be treating the guilty plea as preclusive on those defenses. This would conflict with the principle that "a judgment based on a guilty plea is not entitled to collateral estoppel effect." (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1528.) Without deciding whether the doctrine of issue preclusion "applies wholesale" in section 1172.6 proceedings, our Supreme Court has concluded that "its contours are informative in this context." (*People v. Curiel* (2023) 15 Cal.5th 433, 451 (*Curiel*).) I see no indication that the Legislature intended to deviate from

4

the usual contours of issue preclusion by applying it to guilty pleas when it assigned trial judges the role of "independent trier of fact" at the section 1172.6 evidentiary hearing to determine whether the petitioner is "guilty of murder" under current law. (*People v. Jackson* (2025) 110 Cal.App.5th 128, 152.)[5]

Accordingly, I believe the trial court erred by ruling that Bravo was not permitted to assert that he was acting in justifiable defense of another. The parties agree, however, that because the section 1172.6 resentencing procedure is purely a creature of state law, the *Watson* test for harmless error applies. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837.) For reasons explained in the majority opinion, I agree that based on the record before us and the specific findings the trial court made, there is no reasonable

---

[5] By contrast, if Bravo had been tried by a jury and it had rejected his claim of justifiable homicide in defense of another, the jury's finding would likely be entitled to preclusive effect in subsequent proceedings under section 1172.6. (See *Curiel, supra,* 15 Cal.5th at pp. 450–460 [applying general principles of issue preclusion to jury's finding of intent to kill in subsequent section 1172.6 proceeding].) Arguably, issue preclusion would apply even if there was no claim of justifiable homicide asserted in the jury trial. (See *id*. at p. 452 [issue preclusion only requires the opportunity to litigate the issue, not whether the litigant availed themselves of the opportunity].) In any event, the legislative history of Senate Bill No. 775 indicates that the Legislature believed the statute usually would not apply to voluntary manslaughter convictions by jury trial. (See Assem. Com. on Public Safety, Analysis of Sen. Bill No. 775 (2020-2021 Reg. Sess.) as amended July 6, 2021, p. 7 ["Because generally neither felony murder nor the natural and probable consequences doctrine are theories on which one can commit voluntary manslaughter (*People v. Turner* (2020) 45 Cal.App.5th 428, 439–440), the bill appears largely inapplicable to voluntary manslaughter convictions by jury trial."].)

5

probability it would have found in Bravo's favor on his claim of justifiable homicide in defense of another.  I therefore concur in the judgment.


BUCHANAN, J.